Pfile, et al. *v.* Borough of Speers (Cross-appeals).

Argued February 25, 1972, before Judges KRAMER, MENCER and BLATT, sitting as a panel of three. Reargued October 31, 1972, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

228

*Melvin B. Bassi,* with him *Woodward & Bassi,* for applicants.

*Jack H. France,* with him *Murphy and France,* for Borough of Speers.

OPINION BY JUDGE MENCER, December 21, 1972:

These appeals are from a decision of the Court of Common Pleas of Washington County reversing the decision of the Zoning Board of Adjustment (now Zoning Hearing Board) of Speers Borough which denied the application for a variance requested by the landowners herein in order that a gasoline service station could be built on the subject property which is zoned R-2 Residence District, a classification which makes no provision for such a commercial use.[1] The applicable zon-

---

[1] "R-2 RESIDENCE DISTRICTS . . .

"Section 401. Use Regulations. A building may be erected or used, and a lot may be used or occupied for any of the following purposes, and no other:

"1. Any use permitted in R-1 Residence Districts.

    [1. Single family detached dwelling.

    2. Telephone central office; utility lines; electric substation, when authorized as a special exception.

    3. Accessory use on the same lot with and customarily incidental to any of the foregoing permitted uses.

    4. Signs, when erected and maintained in accordance with Article IX of this ordinance.]

"2. Two-family detached dwelling.

ing ordinance has not been amended in relevant part since its passage in 1950.

The subject property (Lot Nos. 141-147) is part of the A. T. Morgan Estate Plan of Lots, No. 5, which was planned by the Wilkinsburg [Allegheny County] Real Estate & Trust Company (Wilkinsburg) and recorded in the Recorder's Office of Washington County on *September 28, 1956.* Sometime in early 1967, C. Vance DeiCas entered into an agreement with Wilkinsburg to purchase the subject property. He later testified that at the time of this purchase, he had not determined whether to use the property for a residential use or for a commercial use, that he had no idea of placing a gasoline station on the site at that time, and that he had knowledge that the property was zoned residential when he bought it.

Then on *May 14, 1968,* a request was made for a variance to utilize the property for an unspecified use. This request incidentally suggested that the property could easily be rezoned commercial. On *May 22, 1968,* the appropriate municipal body decided that more information was needed concerning the intended use of

---

"3. Two-family semi-detached dwelling, provided that the dwelling with which it has a party wall in common is erected at the same time.

"4. Multiple dwelling.

"5. Single family attached dwelling, provided that such shall not be constructed in series of more than 6 dwelling units, and further provided that all units of a series shall be constructed at the same time.

"6. Parking lot when authorized as a special exception.

"7. Public or parochial educational institutions; religious or philanthropic uses, excluding hospitals, sanitariums and correctional or penal institutions.

"8. Municipal building and municipal use including fire department.

"9. Signs, when erected and maintained in accordance with Article 9 of this ordinance."

the property, but it unanimously opposed any rezoning of the property from residential to commercial. Nine days thereafter, Wilkinsburg formally conveyed to Mr. DeiCas and Veronica Mae DeiCas, his wife, Lot Nos. 141-147 inclusive. Then by deed dated *June 4, 1968* (recorded *June 20, 1968*), Mr. and Mrs. DeiCas conveyed to Mr. and Mrs. Bassi and Mr. and Mrs. Pfile a two-thirds interest in the property, the "purpose of this deed [being] to vest in the Grantees [including Mr. and Mrs. DeiCas] the title to said premises in equal one-third shares, as tenants by the entirety, respectively."

On *June 3, 1968,* Mr. Bassi requested that a hearing be held on the May 14, 1968, variance request (inexplicably, he was not informed, until *July 1, 1970,* that such a hearing would be held), and on *June 14, 1968,* he further requested the Borough Council to open to the public the only access road (Belmont Alley) to the property. This latter request was denied on *July 3, 1968.*

The landowners subsequently entered into a lease agreement with Atlantic Richfield Corporation conditioned on the granting of a variance for the property in order to permit the construction of a gasoline service station. A building permit in order to construct a gasoline station was applied for on *May 21, 1970,* but was denied because of the proposed commercial use in a residential zone.

A hearing concerning the request for a variance was finally held on *July 15, 1970,* by the Zoning Board of Adjustment which subsequently denied the request. An appeal was taken to the lower court which reversed the Board's decision, subject to certain conditions. These cross appeals resulted (1) because the Board took exception to the reversal of its denial of the variance application; and (2) because the landowners took excep-

tion to a condition imposed by the lower court that no "high-rise" (over 20 feet) sign advertise the proposed station's location. Since the lower court took no additional evidence, our duty is to determine whether the Board clearly abused its discretion or committed an error of law.

The court below described the property's location as follows: "The location for the proposed gasoline station is a tract of land situated at the intersection of Legislative Route 62141 as relocated and Ramp XI of the Speers interchange for Interstate Highway 70. The tract is bounded on the southwest by Legislative Route 62141, on the northeast by an alley [Belmont Alley] in the A. T. Morgan Estate Plan of Lots, No. 5, beyond which sit various houses in said plan. On the west it is bounded by Ramp XI aforesaid and on the east by Legislative Route 62141 again as the Legislative Route curves to the north. It is a triangle of land comprising 0.8736 acres with frontage along the Legislative Route of about 485 feet and a depth along Ramp XI of about 70 feet which narrows as the Legislative Route cuts into it as the Route travels east."

Interstate 70, with its Ramp XI constituting the property's western boundary, and L. R. 62141, which was relocated so as to bisect Morgan Plan No. 5, were constructed some time after 1956 (the record does not indicate when). As originally planned by Wilkinsburg, however, Lot Nos. 141-146 were rectangular in shape, being 100 feet long and 60 feet wide. The westernmost lot, No. 147, was more square in size, being approximately 75 feet wide. A street, Helen Avenue, divided Plan No. 5 and served as the southern boundary of Lot Nos. 138-147 inclusive.

Using the official drawings in the record as a guide, the construction of L. R. 62141 seems to have progressively curtailed the southern boundaries of the lots.

The lengths of Lot Nos. 141-146 were substantially and successively decreased leaving little remaining of Lot No. 141. Lot Nos. 138-140 now seem to be a part of L. R. 62141, which is named Maple Avenue and supersedes Helen Avenue. The width of Lot No. 147 was decreased by nearly half by the construction of Ramp XI. Its length remains nearly the same. Belmont Alley, which served as the property's northern boundary, remains unchanged as to Lot Nos. 141-147. Of particular note is the fact that L. R. 62141 was necessarily constructed at a level varying up to 11 feet below the surface of Lot Nos. 141-147.

There can be little doubt, therefore, that this property is substantially different in character from what it was when zoned residential in 1950 and when planned into lots in 1956. The landowners, therefore, contend that a residential classification of their property is unsuitable, and that the only realistic use of the premises is commercial, preferably their proposed gasoline station. There already exists a gasoline station across the street (L. R. 62141) from the property and yet another such station 300 feet distant on the other side of I-70. Each of these stations has a "high-rise" sign. The landowners further point to the heavy traffic on L. R. 62141, the proximity of I-70 and the ramps to it, as well as the elevated terrain of their property. Further, they point to the Borough Council's refusal to open to the public Belmont Alley, thus preventing easy access to the property.

In *Richman v. Zoning Board of Adjustment,* 391 Pa. 254, 259, 137 A. 2d 280, 283 (1958), the Supreme Court said: "The sole justification for the grant of a variance is that a strict application of the terms of the zoning statute will result in an 'unnecessary hardship,' and, even then, the variance can be granted only if 'the spirit of the ordinance shall be observed; the public

health; the public safety; and the general welfare secured; and substantial justice done.' . . . He who seeks a variance has the burden of proving justification for its grant. The 'hardship' which must be proven must be an 'unnecessary,' not a 'mere' hardship, . . . as well as 'unique or peculiar to [the property involved] as distinguished from the impact of the zoning regulations on the entire district.' "

We affirm the lower court's decision because we feel the landowners successfully carried their burden.

The Board found as a fact that a hazardous traffic problem would be created by the proposed gasoline station, primarily because heavily-traveled L.R. 62141 curves around to the proposed station site and creates "a bar to the view of traffic entering and exiting the service station and of oncoming traffic." Mr. DeiCas testified, however, that "[t]he whole area will be day-lighted . . . so that there will be maximum sight distance from the exit or entrance into the station, all along Maple Drive, on all the property that we own, so that all the property will be graded so that there will be no hazard created," and the lower court imposed as Condition (a) to its order: "Excavation shall be carried out along the entire length of the tract as it fronts on Route 62141 so that no banks of earth interfere with a view of the station as one drives west on Route 62141."[2] We think that this reasonable condi-

---

[2] The remaining conditions were:

"(b) A stone retaining wall shall be constructed behind the station to retain the earth so that the land at about the location of Belmont Alley shall not slide or erode and so as to beautify the area behind the station. Concrete block cannot be used for such wall.

"(c) A screen of evergreen trees not less than five feet in height shall be planted along the rear of the lot (about the location of Belmont Alley) and maintained in live condition. The screen shall be composed of trees planted closely enough together

tion will prevent the increased traffic from causing a serious detriment to the community.

The Board also concluded that the property can be used as presently zoned. It found that "[t]here is a market available to the property owners. The abutting property owners were seeking to purchase the property for residential purposes." It further notes that both Mr. DeiCas and Mr. Pfile testified that they had never offered the property for sale for residential use.

Generally, economic or financial hardship is not *in itself* sufficient to sustain the granting of a variance, but ". . . this doctrine has only been applied where it is a question of more profits from one type of development as opposed to another type of development." *Gro Appeal,* 440 Pa. 552, 555, 269 A. 2d 876, 878 (1970). However, when, *on rare occasions,* the record appears to show "property hardship" in the sense of total loss of usability for any of the permitted uses, a use variance will be affirmed, as in *Ferry v. Kownacki,* 396 Pa. 283, 152 A. 2d 456 (1959), where a two-acre tract in a residential district was allowed to be used for a gasoline station. *See also Andress v. Zoning Board of Adjustment,* 410 Pa. 77, 188 A. 2d 709 (1963); *Garbev Zoning Case,* 385 Pa. 328, 122 A. 2d 682 (1956).

Variances, especially those authorizing a commercial use in a residential district, should not be granted with a lavish hand. But we conclude that the lower court was correct in deciding that such a "property hardship" existed here. The effect of (1) the Borough's refusal to open Belmont Alley so that the property might possibly be used for one of the permitted

to cut off the sight of the station by one looking south from north of the station.

"(d) There shall be no so-called high rise sign advertising the station which shall project more than twenty feet above the ground."

uses; (2) the sharp declivity at the rear of the property caused by the construction of L.R. 62141; (3) the heavy traffic flow of that roadway; (4) the existence of a gasoline station on the opposite side of L.R. 62141; (5) the existence of Ramp XI of I-70 as the property's western boundary; and (6) the proximity of I-70 itself is to isolate the tract and render it quite useless unless a variance is granted to permit a more realistic use of the property.

It is no argument to say the abutting property owners wish to buy parts of the property in order to extend their rear yards across the unopened Belmont Alley. This would, as the Supreme Court stated in *Ferry v. Kownacki, supra,* 396 Pa. at 287, 152 A. 2d at 458, render the present owners "land-poor indeed," creating "no value above a 'distinct sacrifice,' " where, very nearly, "buying sharks can always be found."

As to the landowners' failure to offer the property for sale for residential purposes, we note the language of Judge PALMER which we recently approved in *Zoning Board of Adjustment v. Koehler,* 2 Pa. Commonwealth Ct. 260, 263, 278 A. 2d 375, 377 (1971) : "[T]he Board contends appellant has failed to sustain the burden of proof of unnecessary hardship because they did not adduce sufficient evidence that there have been actual attempts to sell the land as it is currently zoned. The legal premise of that argument is the proposition that as a matter of law those seeking a variance must prove that the land has in fact been offered for sale and that no buyers have appeared. For this proposition respondents cite no authority. Proof that land cannot be sold for any use permitted by the ordinance is evidence that the land will not yield a reasonable return if the uses are confined to those permitted by existing zoning regulations. To be sure, inability to sell after a sustained and vigorous effort to do so is evi-

dence that the land is not saleable for a permitted purpose. But it is not the only evidence which might be adduced to show that land cannot be sold for any use permitted by the ordinance. The Pennsylvania Supreme Court has, on numerous occasions, sustained findings of unnecessary hardship where no evidence of attempt to sell was recited. Garbev Zoning Case, 385 Pa. 328 (1956); Nicholson v. Zoning Board of Adjustment, 392 Pa. 278 (1958); Forest Hills Borough Appeal (Re Dance Oil Service Co.), 409 Pa. 392 (1963)."

Finally, the Board did "not feel that an owner may create his own 'unnecessary hardship' and then rely upon it to secure a variance." This conclusion was no doubt prompted by the fact that Mr. DeiCas bought the property for investment purposes only and that he knew the property was zoned residential when he bought it. The Supreme Court recently delineated when the "self-inflicted hardship" rule was to be applied: "Only in a case such as this, which arises after the property has been sold to a new owner who has paid a high price for the property because he assumed that a variance which he anticipated would justify his price, do we hold that the owner cannot prove that the hardship which burdens his land was unnecessary rather than self-inflicted." *Gro Appeal, supra,* 440 Pa. at 560, 269 A. 2d at 880-1.

The record does not reveal, however, what price Mr. DeiCas paid for the property originally, although it is clear that the Bassis and the Pfiles together paid $2,666.66 for the two-thirds interest which they acquired from Mr. DeiCas. Furthermore, there is nothing in the record to indicate that the property was purchased with the assumption that a variance would be needed to justify the price. (Mr. DeiCas's investment could well have been for residential resale.) In fact, Mr. DeiCas, as previously noted, had not decided

whether to use the property for a residential or a commercial purpose. It seems that only after the Borough effectively denied public access to the tract did the landowners resort to their agreement with Atlantic Richfield Corporation.

Lastly, we see no reason to disturb the condition imposed by the lower court that no "high-rise" (over 20 feet) sign advertise the proposed station's location. Conditions placed on the grant of variances are permissible. *Nicholson v. Zoning Board of Adjustment*, 392 Pa. 278, 140 A. 2d 604 (1958). Section 912 of Article IX of the Pennsylvania Municipalities Planning Code, Act of July 31, 1968, P. L.       , No. 247, 53 P.S. §10912, permits a board, when granting any variance, to impose reasonable conditions and safeguards. Here the lower court reversed the Board and had the same power to impose reasonable conditions relative to the grant of the variance. We believe that the height limitation imposed by the lower court is reasonable.

Order affirmed.

---

DISSENTING OPINION BY JUDGE BLATT:

I must respectfully dissent.

The majority has held that the landowners in this case are entitled to receive a variance to build a gasoline station and that the Zoning Board of Adjustment (Board) abused its discretion in failing to grant such a variance.

It is well recognized, I believe, that a landowner must carry a heavy burden in order to prove that he is entitled to a variance. "In order to obtain a variance the law is well settled that an applicant must prove (1) the variance will not be contrary to the public interest; *and* (2) unnecessary hardships will result if it is not granted." (Emphasis in original.) *Altemose Construction Company v. Zoning Hearing Board*, 3 Pa.

Commonwealth Ct. 328, 332, 281 A. 2d 781, 783 (1971). "An applicant seeking a variance has the burden of proving that he has met both of the above criteria." *Boyd v. Wilkins Township Board of Adjustment,* 2 Pa. Commonwealth Ct. 324, 326, 279 A. 2d 363, 364 (1971). A variance should not be granted where the record is "completely barren as to any evidence demonstrating that the land in question cannot possibly be used within the permissible uses enumerated under the present zoning classification. . . ." *Marple Township Appeal,* 430 Pa. 113, 114, 243 A. 2d 357 (1968). In this case, however, the landowners presented virtually no evidence either to prove that the existing zoning will cause an unnecessary hardship by making the property unusable as zoned or that the variance will not be adverse to the public interest.

The majority holds that the combination of geographical location and topographical features here present is sufficient to render the property useless unless a variance is granted. But the majority has made this assumption despite the fact that the landowners placed no competent testimony into the record to indicate that the property could not be used as zoned. One of the landowners, Mr. Deicas (who is a professional engineer), testified that the property could not be used for residential purposes because there was insufficient access thereto and there were no utility facilities on the property. There was no testimony, however, that such facilities were not immediately available, and as to access, Mr. Deicas testified that at one point along Maple Street, where the elevation is 6 feet, a 35-foot driveway could be placed with a grade of only 18%. In any case, there was no testimony as to why either of these was sufficient to make the property unusable. There was no testimony as to the value of the property as currently zoned; no testimony as to the possibility

of using the property for other purposes authorized in an R-1 District (such as apartments) ; no testimony as to the costs of changing the grade of the property, as there was in *Zoning Board of Adjustment of Hanover Township v. Koehler,* 2 Pa. Commonwealth Ct. 260, 278 A. 2d 375 (1971) ; and no testimony that the adjacent highways or the nearby gasoline station would render the property useless if it continued as an R-1 District. While there was testimony that the highest and best use of the property is as a gasoline station, such testimony points only to the possibility of an economic hardship, and an "[e]conomic hardship does not constitute such a unique, unnecessary hardship peculiar to the property involved that will in itself justify the issuance of a variance. . . ." *DiSanto v. Zoning Board of Adjustment of Lower Merion Township,* 410 Pa. 331, 334, 189 A. 2d 135, 137 (1963).

The majority holds that a variance is mandated merely because of the physical conditions of the area. No testimony is cited, however, as to the effect which such physical characteristics have on the value of the property. Indeed, such testimony does not exist in the record. The majority lifts the burden of proving an actual hardship from the landowners, and *assumes* on its own, as did the court below, that these physical characteristics, as shown on maps, photographs, contour diagrams and other such physical evidence, make the property unusable as zoned. Meanwhile, it ignores the fact that no evidence was introduced as to the effect of these features upon the value or the usefulness of the property in question.

This decision changes the standards of proof in variance cases. In the future it will apparently be merely necessary for landowners to show that their property contains unique physical characteristics. The effects of such physical characteristics on the use of the prop-

erty as zoned need not be testified to, but this Court and the lower courts will be permitted to sit as super zoning boards and use their own judgment as to whether or not the property can be used as zoned. The adverse effect of such a standard upon rational land use planning can be easily understood.

Moreover, in addition to failing to prove an unnecessary hardship in this case, the landowners have failed to prove that the grant of a variance would not be contrary to the public interest. The law seems clear that "the variance can be granted only if 'the spirit of the ordinance shall be observed; the public health; the public safety; and the general welfare secured; and substantial justice done.'" *Richman v. Zoning Board of Adjustment,* 391 Pa. 254, 259, 137 A. 2d 280, 283 (1958). Yet here there was extensive testimony that prevailing winds in the area would carry gas fumes from the proposed station directly over the neighboring houses. This was never contradicted by the landowners, and the Board relied on this point in finding that a gasoline station at this location would not be in the public interest. Did the Board abuse its discretion in making such a finding? I think not.

There was also testimony at the hearing concerning the possibility that increased traffic and new traffic patterns brought about by the building of a gasoline station would cause a hazard and be a detriment to the community. Clearly, traffic hazards involve the public safety and welfare, and the burden of showing that public safety and welfare will not be endangered is on the applicant in a variance case. There was testimony at the hearing that traffic coming out of the gasoline station onto heavily traveled, curving Maple Avenue would cause a traffic hazard, and, although the landowners did testify as to steps they would take to obviate such dangers, it was hardly an abuse of discre-

tion for the Board to find that the landowners had not carried their burden of proving that a danger to the public safety and welfare would not exist. The majority states in its opinion that certain conditions imposed by the lower court will prevent the increased traffic from being a serious detriment to the community. Again, this is merely a substitution of the lower court's and of this Court's judgment for that of the Board.

It should be noted, moreover, that there seems to be a strong indication that any hardship in the use of this property (although of course, there is no evidence of hardship) was self-inflicted. The landowners knew that this property was zoned R-1 when they purchased it, and, despite such knowledge, they went through with the deal. Surely, under these circumstances, they cannot claim an unnecessary hardship. *McClure Appeal,* 415 Pa. 285, 203 A. 2d 534 (1964); *Drop v. Board of Adjustment,* 6 Pa. Commonwealth Ct. 64, 293 A. 2d 144 (1972). The majority cites *Gro Appeal,* 440 Pa. 552, 269 A. 2d 876 (1970), and states that "there is nothing in the record to indicate that the property was purchased with the assumption that a variance would be needed to justify the price." Yet there is in the Record a letter from Mr. Pfile to the Borough dated May 14, 1968, a month before Mr. Pfile actually purchased his interest in the land, and, in this letter, Mr. Pfile asked for a variance because the property "doesn't lend itself to any other kind of use except that of some minimal commercial usage, to which I hope to put the property. . . ." This certainly indicates that at least one of the landowners purchased the property with the belief that it would be worthless unless a variance would be granted. It would seem difficult to cite a clearer example of self-inflicted hardship.

Lastly, the majority seems clearly to have erred in stating this Court's scope of review. As the majority

puts it: "Since the lower court took no additional evidence, our duty is to determine whether the Board clearly abused its discretion or committed an error of law." The lower court judge, however, did make a view of the property in question. In the lower court opinion, he stated: "We traveled to the site and inspected it and some of our comments are based upon observation." Such a view and its use in the lower court's opinion seems clearly an admission of relevant evidence, and the lower court was *not* deciding the case solely on the record received from the Board. In *Beebe v. Media Zoning Hearing Board*, 5 Pa. Commonwealth Ct. 29, 288 A. 2d 557 (1972), this Court held that, if a lower court admits relevant evidence in a zoning case, it acquires a duty to decide the case de novo and on the merits. To the same effect, *see Lester Hauck v. Wilkes-Barre City Zoning Board of Adjustment*, 2 Pa. Commonwealth Ct. 76, 276 A. 2d 576 (1971). In this case the lower court seems to have realized its obligation to hear the matter de novo, because it made findings of fact and conclusions of law. Our review, therefore, should be as to whether or not that court abused its discretion, rather than as to the propriety of the ruling of the Board.

Very little evidence of any effort on the part of the landowners to carry their heavy burden in proving that the grant of a variance was mandated was to be found anywhere in the record in this case, and, in view of the record, I can find no basis on which to hold either that the Board abused its discretion or committed an error of law or that the lower court had any evidence on which to base its decision granting the variance. I would reverse the ruling of the lower court and reinstate the Board's order that the variance be denied.

Judge ROGERS joins in this dissent.